JOHANNA M. ANDERSON, ADMINISTRATRIX, APPELLEE, V. MISSOURI PACIFIC RAILWAY COMPANY ET AL., APPELLANTS.

FILED FEBRUARY 27, 1914. No. 17,374.

1. **Master and Servant:** INJURY TO SERVANT: CONTRIBUTORY NEGLIGENCE: INTOXICATION. That a section foreman of a railroad company, who was injured in the company's yards, was in a state of intoxication at the time is evidence of contributory negligence.

2. ———: ———: DUTY OF MASTER. Where the foreman of a gang of section-men employed by a railroad company is found in the company's yards in disobedience of the orders of his superior officer, the company owes him no other duty than not to purposely or wantonly injure him.

3. ———: ———: LIABILITY OF MASTER: EMPLOYERS' LIABILITY ACT. Where a section foreman is supposed by his superior officer to be intoxicated, and is ordered by him to go home and stay there, and in disobedience to such orders afterwards returns to the company's yards in an unfit condition to work, and attempts to take charge of the section-men, he becomes a mere volunteer or trespasser, and, if injured, the employers' liability act (laws 1913, ch. 198) affords him no grounds for recovery.

4. ———: ———: RAILROAD SECTION-MEN: DUTY OF ENGINEER. An engineer operating his engine in the yards of a railroad company has a right to assume that the section-men in the yards will take notice of and look out for moving trains, and no duty or obligation rests upon the engineer to assume that they will not get out of the way of such trains.

5. ———: ———: LAST CLEAR CHANCE. The doctrine of the last clear chance has no application to the case where a section fore-

man in a railroad company's yards suddenly goes upon the track in front of a moving engine and train of cars, at a point so near the engine that it was impossible to stop and avoid injuring him.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Reversed.*

*Edgar M. Morsman, Jr., J. A. C. Kennedy* and *B. P. Waggener,* for appellants.

*W. W. Slabaugh* and *J. W. Battin, contra.*

BARNES, J.

The plaintiff, as administratrix of the estate of her deceased husband, Carl A. Anderson, brought this action to recover damages for his death, which she alleged was caused by the joint negligence of the defendant, the Missouri Pacific Railway Company, and the engineer in charge of the locomotive, which struck and killed him. By their answers defendants admitted the allegations of the petition setting forth the representative capacity of the plaintiff, the corporate character of the defendant, that it owned and operated the engine and train of cars referred to in the petition, that plaintiff's decedent was struck by the defendant's engine and received injuries from which he died. All of the other allegations of the petition were denied, and it was alleged that the plaintiff's decedent was not in the defendant's employ at the time he received his injury, but had been discharged prior thereto, and at the time he was injured Anderson was a trespasser, was intoxicated and under the influence of liquor, and stepped directly in front of defendant's moving train, thereby receiving the injuries resulting in his death. The reply put in issue the averments of the answer. The cause was tried to the district court for Douglas county and a jury, and a verdict was returned against both defendants for $9,999. Motions for new trials were overruled, a judgment was entered upon the verdict, and both of the defendants have appealed.

It appears that the defendant railroad company owns large yards and terminals in Omaha located in the north-

ern part of the city, and extending northward from what is called Webster street station for the distance of more than a mile. There are four tracks, one of which was known as the main passenger track, another as the round-house track, and the other two as holding or switch tracks, near and parallel to each other in the defendant's yards. Plaintiff's decedent was foreman of a gang of men who had charge of that part of the defendant's yards, lying between Locust street and the Webster street station, and it was his duty, with the help of his gang, to keep the tracks in condition in that part of the yards. The tracks north of Locust street were under the care of another foreman, who had his own gang of men. In addition to the two gangs just mentioned, there was present at the time of the accident a third or extra gang in charge of a separate foreman. Anderson was hired by, and directly subject to, the orders of defendant's roadmaster, J. L. Buzzard, who was in charge of the Omaha yards and terminals, having full power to hire and discharge the section-men. On the evening of the 30th day of December, 1909, the rails of the main track at a point a short distance north of the Webster street station spread, thereby derailing a couple of freight cars. This derailment blocked the main line, and compelled passenger trains going between the yards and the station to use the roundhouse track for the purpose of passing the derailment. Ordinarily it would have been Anderson's business to take his gang to the place of the derailment and repair the main track after the cars had been removed therefrom by the wrecking crew; but road-master Buzzard had his attention called to the fact that Anderson was intoxicated, and specifically ordered him to go home and keep away from the work. He sent a Mr. Grandinett, Anderson's assistant, and his gang, to the place of the derailment to repair the main track. E. C. Ciol, sometimes called "Rugge," was the foreman of the extra gang, and when Buzzard sent Anderson home he superseded his authority and put all of the men in charge of the foreman of the extra gang.

It appears from the testimony that when Anderson was ordered to go home he started in that direction, and was not seen again by the men at the place where they were working until a short time before he was injured. The two gangs of men sent to repair the main track worked by torch light. About 8 or 9 o'clock Anderson turned up, and attempted to again boss the job. There is evidence in the record from which it appears that he was badly intoxicated, while it is shown by other evidence that he might have been sick. In any event, he was not in his natural or normal condition. Buzzard was not then present, and never saw Anderson after giving him his orders to go home. About 9 o'clock the regular passenger train came down the roundhouse track to the station, and as it passed the point where the men were working on the main track Anderson got in front of the moving train and was injured so badly that he died about three hours later. Defendant, Peter Gannon, was the engineer in charge of the engine which struck Anderson, and, together with the railroad company, he was made a party defendant to this suit. The accident occurred in the yards and upon the private property of the defendant, the Missouri Pacific Railway Company.

It is contended that the trial court erred in giving the tenth paragraph of his instructions to the jury. By this instruction they were told that intoxication of itself did not constitute negligence on the part of Anderson, but if the jury believed Anderson was under the influence of liquor, and if they further found that such condition was the cause of his remaining about the yards, or was the cause of his getting upon the track, then such condition of intoxication was a matter to be taken into account in determining whether or not the injury resulted from the negligence of the deceased. It appears that Anderson was notified of the derailment, and instructed to act immediately. He was at the scene of action and undertook to direct the men, when his superior officer, the roadmaster, came and ordered him to go home. He testified that Anderson was intoxicated, and he told him to go home and

stay there, that he was not fit to attend to the work. Several witnesses testified to having heard this order, and that Anderson at the time was drunk. The plaintiff claims that a question of fact was raised as to whether Anderson was drunk, and her brief refers to evidence in the record to show that there was a conflict of the testimony upon that point. The evidence that the plaintiff relied upon was the cross-examination of the defendant's witnesses. One witness, after testifying that Anderson was drunk, was asked upon cross-examination whether it was not possible that Anderson was sick and overworked that made him act as he did, and the witness answered that he thought that was possible. This is the kind of evidence by which plaintiff sought to prove that Anderson was not drunk. If Anderson was sick, or for any reason acted like an intoxicated man, and the roadmaster thought he was drunk, and told him that he was not fit to work, to go home, and thereupon put another man in Anderson's place, who took charge of the work, it would make no difference whether Anderson was really drunk or was sick. If the roadmaster thought he was drunk, and others also thought so, he should have gone home and stayed there as directed by the roadmaster. It is argued, however, that he was not discharged, and was still in the employ of the defendant. Of course his discharge was not complete until he was given his time and pay. He was still technically an employee of the railroad company, but this does not help the plaintiff's case. It was supposed by the roadmaster that Anderson was not in a condition to be in such a dangerous place, and he was ordered home. If he was an employee, he disobeyed orders that were wholesome and were necessary for his own protection, and it makes no difference whether he was intoxicated or was sick. If the jury believed that he was intoxicated, that was evidence of negligence on his part; for it may well be said that, if an intoxicated person enters a railroad yard where trains are constantly running in all directions and upon different tracks and is injured, his intoxication in such case is evidence from which negligence may be inferred.

It is also contended that Anderson's presence in the yards at the time he was injured was in defiance of and contrary to the orders of his superior officer; that the road-master had directed him to go home, and had delegated to another the duty of repairing the main track, and under those circumstances the defendant owed Anderson no duty other than not to wantonly run him down and injure him. The evidence shows, without dispute, that Anderson usually stopped work at 6 o'clock p. m.; that at the time of the accident he was not in charge of his gang of men; that they were under control of "Rugge;" that about 7:10 p. m. Anderson was specifically told by the roadmaster, Buzzard, to go home and stay, and not to come back any more, and "Rugge" was sent to take charge of the work of repairing the main track. Several witnesses testified that they heard the instructions given to Anderson, and no witness contradicted that testimony. It may be that those instructions did not constitute a discharge; but surely they were explicit and not capable of being misunderstood in reference to the fact that Anderson was told to go home, and was instructed to have nothing to do with the work. Disobedience of express orders has always been held to bar a recovery by a servant who is injured under circumstances where, had he obeyed the instructions, he would not have been injured.

Anderson's acts and disobedience of the express orders of his superior officer were such that it is hardly consistent with justice to say that his acts constituted slight negligence within the meaning of the employers' liability act. Laws 1913, ch. 198. It was erroneous to submit this case to the jury under the provisions of that act, for Anderson's presence at the place where he was injured on the evening of December 30 was in direct disobedience of the orders given him by his superior officer.

In *Western Mattress Co. v. Ostergaard*, 71 Neb. 572, it was said: "If a servant's injury is the direct result of his own disobedience of orders given by one in charge of the work in which he is engaged, he is guilty of contributory negligence and is not entitled to recover therefor." This

rule is supported by *O'Brien v. Staples Coal Co.*, 165 Mass. 435; *Rome & D. R. Co. v. Chasteen*, 88 Ala. 591, 7 So. 94; *Mendota Light & Heat Co. v. Lafferty*, 92 Ill. App. 74; 1 Labatt, Master and Servant (2d ed.) secs. 2-13a.

Anderson was hired to perform such duties and such work as the master had prescribed. When Buzzard told him to go home, and turned the work over to another, the employment of Anderson did not extend to the doing of the work in question. There was no occasion for his being in the yards on that evening, and his act in going there was clearly beyond the scope of his employment. Hence, he became a mere volunteer or trespasser, and the employers' liability act has no application to this case.

It is further contended that the evidence fails to disclose any negligence on the part of the appellants. The petition avers that defendants were negligent in four respects: First, no signal or warning by bell, whistle or otherwise was given of the approach of the engine; second, that the engineer was running at a dangerous rate of speed; third, the engine was not stopped before injuring the deceased, though by exercise of proper care the engine and train could have been stopped in time to prevent the injury; fourth, no lookout was kept or maintained at the place where deceased and his gang of men were working.

There seems to be no evidence in the record tending to support the first allegation of negligence. All of the witnesses who testified either heard the whistle blow, or heard the bell ring, though some of them did not hear both warnings. The engine could have been seen for a distance of a mile northward from the place of the accident. It had one of those brilliant electric headlights which of itself was sufficient warning to everybody. Under this testimony it was erroneous to permit the jury to find appellants negligent for a failure to give a signal of the approach of the train.

It must be conceded that there are some dangers in the various activities of life which cannot be eliminated, and a railroad yard presents such a case. The effort to give adequate warning to workmen in a railroad yard would of-

ten add to the confusion and danger, in that so many engines and trains would be sounding bells and whistles that a workman would be more confused than under the present system of procedure, where the workman is expected at all times to be on his guard for trains and keep out of their way.

In *Ives v. Wisconsin C. R. Co.*, 107 N. W. 452 (128 Wis. 357), it was said: "That a train was running within city limits at a speed greater than that allowed by law did not relieve a section-man from the rule that section-men on railroads assume the risk of trains of all sorts, regular or wild, running over the tracks at all times and at such speeds as are attainable, without notice or warning except such as results from the noises of the train, including customary signals. That a train by which a section-man was struck and killed was running at an unusual rate of speed in the place where the accident occurred does not relieve the section-man of the assumption of risk of injury from trains."

We think it is reasonably clear that the defendant was not guilty of any negligence in that regard. The foregoing also disposes of the question of the rate of speed alleged in the petition, and, in any event, there seems to have been no competent evidence that the train which struck and injured Anderson was running at an excessive rate of speed.

As to the averment of negligence on the part of the defendant in not keeping a lookout at the place where the deceased and his gang of men were working, there seems to be no evidence in support of that averment, and if, as contended by the plaintiff, Anderson was in charge of his gang of men at the time of the accident, it was his duty to have kept and maintained such a lookout. Therefore, it was erroneous to permit the jury to hold appellants guilty of negligence for failing to maintain a lookout where Anderson and his gang of men were working.

The foregoing discussion, and the authorities cited, apply with equal force to the contention of appellant Gannon. He had the right to assume that Anderson and his

section-men would keep out of the way of his train, and it is clearly manifest that the doctrine of the last clear chance can have no application to the facts of this case. An engineer operating his engine in the yards of a railroad company has the right to assume that the workmen in the yards will take notice of and look out for moving trains, and no duty or obligation rests upon him to assume that the workmen will not get out of the way of the locomotive. Any suggestion that the engineer must know that the workmen will not get out of the way would mean the destruction of the rule which applies to workmen in railroad yards. Again, engineer Gannon testified that he brought the train from the roundhouse to the depot; that he was sitting on the right-hand side of the engine; that all at once there was a man that stood the farthest from the gang, who started to walk up the track a little, then turned and fell across the track he was on. He was about two car lengths from the engine when he started to walk along the track. "When he got to the track I was on, he was about 15 feet from the engine. Then I threw the engineer's brake valve emergency and blowed the whistle. I did not think I hit the man at all. I did not think I got up to him." On cross-examination he testified: "When I whistled at Ohio street all the men seemed to look up; they were working 15 or 20 feet west of the track I was on. Q. What did you next see him do? A. Well, he kind of turned and looked at the engine again, and then made kind of a cut and fell across the track. The engine was about three car lengths away. * * * I observed him fall, and it looked as if he were going toward the track; as he fell he was 15 feet away." This evidence was undisputed except by the testimony of one of the witnesses, who placed the distance between the engine and Anderson, when he got upon the track, at several car lengths. There was another witness who testified that he thought the engineer was looking toward the men at the side of the track, and not in front of his engine. But this testimony was entitled to very little, if any, weight, as against the positive testimony of the engineer. It therefore seems clear that when

Anderson got upon the track he was so near to the moving engine that it was impossible to have stopped it in time to have avoided the injury.

Many other errors are alleged, which we have not the time or space to discuss, but from what we have already said it is apparent that neither of the appellants had a fair trial, and for the errors herein pointed out the judgment of the district court is reversed as to both of the defendants, and the cause is remanded for further proceedings.

REVERSED.

REESE, C. J., dissenting.

I find myself unable to agree to the opinion of the majority of the court in this case, and will briefly state the grounds of my dissent.

I think it must be conceded that the evidence establishes beyond question that the track yards, where the spreading of the rails and derailment of the freight cars occurred, were in very bad condition. Snow had fallen, and the ground was soft and muddy. Both the passenger track and the roundhouse track, paralleling each other, were uneven, and, in reality, unsafe for the passage of cars or trains, except by the exercise of great care. Decedent was the foreman of a gang of men in charge of those particular tracks and others within his territory. After the completion of the day's work the men constituting the force under decedent's care had gone to their several homes and lodging-houses. After they had separated the derailment occurred. The roadmaster, having been informed of the spreading of the track and derailment of the cars, ordered decedent to call out his men and assist in restoring the track and removing the wrecked or derailed cars. Decedent did as directed, and, instead of returning to his home for his evening meal, he went to a telephone, and by its use, directed his son to bring his supper to him. It was then night, and the men, not only of his force, but another gang of track men, were assembled to remove the derailed cars and restore the track. Probably about the time the

men were being assembled the roadmaster concluded that decedent was intoxicated and ordered him to go home. Upon the particular question as to what that order was, there is a conflict in the testimony. The roadmaster and some others testified that the order was to go home and keep away from the work. Others testified that all that was said was for him to go home. The roadmaster testified that he made use of language substantially as stated in the majority opinion, but upon cross-examination it was shown by him that he was a witness at the coroner's inquest, held very soon after the accident, where the subject of the extent of this order was under investigation, and the question was asked him as to what he said, and he answered that he simply told decedent to go home. The question was asked him: "Didn't you say before the coroner's inquest, 'I simply ordered him to go home?'" His answer was: "Yes, sir; I said that." "Q. You simply ordered him to go home? A. Yes, sir." This did not amount to a discharge, nor was it an order to "keep away from the work," as contended by defendant.

There is a direct conflict in the evidence as to decedent's intoxication at all. Witnesses who observed him stated that there seemed to be something wrong with him at the work of clearing and restoring the track, but whether intoxicated or sick they could not say. Immediately upon being run over by the train, he was taken up and conveyed to a hospital, and no one detected any evidence of inebriety about him, notwithstanding special investigations were made before his death. He had never been known to be intoxicated during the time he was under employment by defendant. Under the evidence submitted, the question of his intoxication was solely for the consideration of the jury.

It was shown that the track known as the roundhouse track was in a bad condition, not suitable for the rapid movement of trains or cars. This was known to the engineer, for he had but a few minutes before passed over it on his way to the roundhouse for the passenger coaches to be used in making up the train at the Union station

Svetkovic v. Union P. R. Co.

for the run to the south. Not only so, but in passing out to the roundhouse he had seen the men at work removing the wreck from the adjoining track and relaying the rails, guided in their work by the use of torches, but he seems not to have sounded his whistle nor rung his bell announcing his return, to warn those men, who, in the confusion of the removal of the derailed cars and the restoration of the track, by the light of their torches, were working immediately by the side of the track over which he was to pass. There was a bright headlight upon his locomotive, the track was straight, and, had he been on the lookout to the front, he could have seen decedent at work upon the track upon which his train was approaching, but no attention seems to have been given to what was in front. Was he negligent? The rule that all questions of fact were for the consideration of the jury seems to have been forgotten. In addition to this, it was shown that decedent was engaged in inspecting and measuring the track, over which the train was passing, in a stooping position, with his back toward the approaching train, the immediate approach of which he had no notice by bell or whistle, until he was run down, and his life destroyed. Was he guilty of negligence? This question was solely for the jury.

As I read the bill of exceptions, the evidence was conflicting upon every material point in the case, and the verdict of the jury and judgment of the district court should not be set aside. What are juries for if not to settle controverted questions of fact upon conflicting evidence?