GRANT, J.
The parties will be designated here as they were below.
Plaintiff’s intestate came to his death as a result of being crushed in an elevator located on premises owned and controlled by the defendant company.
The trial was to a jury. There was a verdict for the plaintiff, upon which the judgment brought here for review was rendered, after a motion for a new trial had been overruled.
At the end of the plaintiff’s case a motion was made by the defendant for a directed verdict in its favor, which was denied and an exception was taken. As this motion was not renewed at the end of all the testimony taken, the exception is not now in that particular form available to the complaining party.
In the view, however, that we have concluded to take of the case, the form of the objection to the judgment under review is not material. The substance of the complaint made to us here is that there is no evidence shown in the record that can be said to support the judgment, a question of course involved in the one raised by the overruled motion for a new trial.
The intestate at the time of his death was of full age. He was not then in the employ of the defendant, or engaged in its service in going into the elevator. He was not there upon any expressed invitation of the defendant. It is claimed in the brief for the defendant in error that there is evidence tending to show an implied invitation. But we do not regard that question, or any question as to the status of the decedent while on the elevator ■ — whether as there by mere license or upon a supposed invitation —as material to the present consideration. It is allowed on all hands that if the plaintiff was entitled to recover at all in the action, it must be because his intestate came to his death while under the protection of the so-called rule of last chance, and by that rule his standing here is to be conclusively tested and ascertained.
The court below, upon the trial, limited the plaintiff’s right of recovery, if he had any, to the sixth specification of negligence of his petition, which was pleaded as follows:
“Defendants failed and neglected to use reasonable care in stopping said elevator so maintained and operated as aforesaid, before decedent was killed thereon, after they saw decedent’s po *365 sition of danger, and in this respect defendants were guilty of gross and wilful negligence which operated proximately to cause decedent’s death.”
This issue, thus formulated, manifestly called for the application of the rule mentioned and precluded the consideration of any other. The law in Ohio upon this recognized doctrine of liability is settled, and will be discussed later. Our present concern is to gather from the record just what the matter of fact in the ease is, and from thence deduce a conclusion as to whether, under the doctrine, the plaintiff has brought his intestate within the sweep of its shield of protection.
The sum total of the facts — making up the single controlling and decisive fact upon which our judgment will depend — is not, as we regard the whole case, in dispute. Its constituent evidence, so far as this is material here, is as follows:
The elevator in question was a freight elevator. It was operated in part by manipulation and partly automatically. The operator in charge was an employe of the defendant company, Joseph by name.
On the day. of his death the decedent came to the premises with some material sent by -his employer to the defendant company, which he delivered by carrying it up to the third floor of the building, using the stairway for that purpose. He was there told that there were some other materials there, to be taken back to his master — these then being on the third floor. They were already loaded on a truck. Joseph, the defendant’s elevator operator, was then told by one of his employers to take this truck load down on the elevator, which he proceeded to do by wheeling the truck to the shaft, lifted the gate and so manipulated the cable appliance as to bring the elevator platform up from the floor below. When it reached the third floor level Joseph did not stop it, although it seems he tried to do so, but the platform kept on ascending towards the fourth floor. When it had so passed up to a distance of about five inches above the third floorj the plaintiff’s intestate, without invitation and unknown to Joseph, climbed upon the ascending platform. He at once attempted to get off — -the elevator platform being still in motion— and while doing so was caught between the rising platform and *366 the descending elevator 'gate and was thrown down the shaft and killed.
The elevator was so arranged that the platform stopped at the fourth floor automatically. But the deceased apparently did not know this, and becoming frightened as he kept on moving upward, raised an outcry, whereupon Joseph called to him to stay on the platform, as it would shortly stop; this warning was several times repeated.
Notwithstanding it, the deceased, frantic with what seemed to him impending danger — for such unquestionably was his state of mind at that time- — continued his efforts to climb off the elevator floor, until the gate — then released and beginning to descend — striking the back of his neck, scraped his body from its position over the edge of the platform and hurled him down the shaft to his death. This release of the gate and its beginning to come down took place when the platform or elevator floor had risen to twenty-one-inches above the level of the third floor. The only way by which the ascent of the elevator could be stopped by manipulation was by the operator reaching around for a distance of nineteen inches and engaging a spring or dog which would have checked the upward movement of the platform, and there is evidence tending to show that Joseph attempted to do this as the elevator passed above the third floor without stopping, although it does not appear that this was in response to any cry of the deceased notifying Joseph of the state of peril he was in.
But, as we view the issue, this also is not material. Whatever attempt at stopping the elevator by the appliance named might have been made, it could not avail to save Burton for sheer want of time to make the effort available; the crash came simultaneously with making the attempt. Besides being altogether futile, the movement, carried any further, would have been at an extreme hazard of life or limb on the part of the manipulator.
According to the testimony of the experts, Mutton and Clark, offered by the plaintiff, and who were allowed over the objection of the defendant to testify as to certain experiments made by them with the same elevator after the accident, the following facts are established: The elevator opening above the *367 third floor was substantially seven feet in heighth. The bottom of the gate was held, automatically, at about six feet above the level of the third floor, and as the elevator rose up the gate was released when the elevator platform reached a height of about twenty-one inches from the third floor level. The speed of the elevator was substantially sixty feet to the minute. The only way by which the elevator could be operated, or its progress arrested by any one outside of it, was by manipulation of the cable, and in the case in hand this could have been done only by the operator reaching beneath the floor of the car after it had passed far enough above the third floor level to enable him to interpose and perform the necessary manipulation. One of the experts says that this could be done by proper manipulation of the cable after the elevator ear had passed a distance of three feet above the level of the third floor, but this is conditioned on the manipulator being an “active” man; in another place it would require a “quick active man” to do it, as he says. The other expert testifies that in an experiment made after the fact he stopped the elevator within a distance of four feet after it passed the third floor level, and that a man could not begin to reach under the elevator car to do the manipulating of the cable until it had reached a heighth of two feet and a half above the level of the third floor.
■ We assume the competency of this evidence, although under other circumstances we should regard it as of doubtful value in that respect. We make no present comment on the effect to be given to it, or as to the conclusions to be reached from it, leaving that consideration till we come to apply the law of the case to it and the other testimony disclosed by the record.
We have already characterized that law as belonging to the doctrine of the last clear chance. It is sometimes also called the law of discovered peril, and courts have referred to it as the humanitarian doctrine, as undoubtedly it in foundation is. For some time it went by the name of the rule of Davies v. Mann, 10 Mees & W. 546, from the case in which it seems first to have been struck out.
Nevertheless, it is a rule of law, measured by the rigidity of law, and not a varying or flexible consideration to be swayed by the appeals of sympathy or pity or helplessness in misfortune, *368 however creditable these may be upon the humane side of mankind, operating outside of courts.
The doctrine, in its application, has been pushed far beyond its first intendment, so far indeed, that it has been used to make a railroad company responsible to the heirs of a suicide — a result which has been characterized as abolishing the law of contributory negligence.
A halt, however, has been called on the extreme use, amounting to an abuse, to which this, in common with every beneficient rule, has been made subject, and in Ohio the application of the doctrine as one of “hit or miss,” to be indiscriminately used, has been clearly denied.
Some attempt at definition of the rule may aid in applying it to the facts of this case. In Quarterly Law Review, Vol. 2, p. 507 — cited with approval of Vizacchero v. Rhode Island Co., 26 R. I., 392 [59 Atl. 105; 69 L. R. A. 188] — it is said:
‘ ‘ The party who last has a clear opportunity of avoiding the accident, notwithstanding the negligence of his opponent, is considered solely responsible.”
In Grand Trunk Ry. v. Ives, 144 U. S., 408 [36 L. Ed. 485], the rule is thus formulated:
“Although the defendant’s negligence may have been the primary cause of the injury complained of, yet an action for such injury can not be maintained if the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution in the person injured, subject to this qualification: That the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party’s negligence.”
For the purposes of the present case and in view of the point upon which our conclusion must rest, it will be sufficient to state the Ohio rule from the negative side. That is to say, to state what will relieve from the operation of the doctrine as applied to the facts, or what found facts will, as matter of law, defeat its application to, and control of them. It is to be found in the second syllabus of Drown v. Northern Ohio Trac. Co. 76 Ohio St. 234 [81 N. E. 326; 10 L. R. A. (N. S.) 421; 118 Am. St. 844] and is as follows:
*369 “ ‘The doctrine of last chance’ as formulated in Cincinnati, H. & D. Ry. v. Kassen, 49 Ohio St. 230 [31 N. E. 282; 16 L. R. A. 674], paragraph one of syllabus, does not apply where the plaintiff has been negligent, and his negligence continues, and concurrently with the negligence of defendant directly contributes to produce the injury; it applies only where there is negligence of the defendant subsequent to, and not contemporaneous with, negligence by the plaintiff so that the negligence of defendant is clearly the proximate cause of the injury and that of the plaintiff the remote cause.”
And in the opinion, p. 248, the negative of the rule is amplified thus:
“Now it must be apparent upon even a slight analysis of this rule that it can be applied only in cases where the negligence of the defendant is proximate and that of the plaintiff remote; for if the plaintiff and defendant both be negligent and the negligence of both be concurrent and directly contributing to produce the accident then the case is one of contributory negligence pure and simple.”
Now, let us apply the rationale of the doctrine as thus made manifest by our Supreme Court, to the undisputed facts, or to the most favorable view for the plaintiff that can be taken of them, as this record shows them to be. If his own witnesses are to be believed, it was about seven feet from the third- floor to the top of the shaft. When the elevator platform was about 21 inches above the third floor the gate became disengaged and began to drop. The deceased was sitting — or we are assuming that he was sitting — on the edge of the platform floor, trying to get off. The descending gate struck him on the neck at not more than four and a half or perhaps five feet above the level of the third floor, when he was forced off and into the pit. The gate, therefore, travelled in the neighborhood of two feet in order to reach his neck. It dropped about 15 feet to the second. This would require less than a half second of time for the gate to come to the point of contact with Burton’s neck. The ascent of the elevator platform was at a speed of about a foot per second, and as it had to travel only about two feet more upward, in order to have the iron fire door of the elevator intercept the view of Burton’s body — this being about seven feet above the third floor level — it follows, demonstrably, that his body became *370 wedged in between tbe falling gate and the edge of the rising platform and he was in consequence forced off and down to his death, while the elevator car was traversing some part of the two feet still remaining. This was the distance within which only he could by the exertion of any possible diligence of effort, have been rescued from his peril, by any manipulation whatever of the appliance for that purpose at the time and place available. And the time within which alone the rescue could have been effected, was less than two seconds — because there was only that interval between the time when the intestate was seen trying to get off the platform and when he was thrown down the shaft and killed; all took place between the level of the third and fourth floors — it must have done so.
The decisive question then is, could Joseph, the operator of the elevator, within these limits of space and time, have discharged any duty he is shown to have known was owing by his master to the now dead man, to the effect of saving his life? We have no difficulty in finding that he could not. He could not have done so by not only the exercise of any reasonable care, but he could not have acted to that end effectually within the limits of a physical possibility. The deceased could not have been saved, within the time and under the undisputed circumstances of the case, by any manipulation of the elevator which Joseph could have put in operation.
Nor does the testimony of the experts enlarge the scope of the possibility of rescue to any practicable purpose, in our opinion, so far as the matters of fact testified to by them are concerned. Giving what they say its utmost weight, still, the conditions considered, the stooping posture into which Joseph must have gotten himself before he could even begin the work of rescue, the narrow space beneath the elevator floor within which he must have worked when he once was down and in a position to work at all, and the distance he must then reach out in order to manipulate the only appliances there were for stopping the elevator — taking all these things into the account, we say, and the plaintiff’s contention of an unperformed duty owing by the defendant, is neither made out nor aided by the experts, granting the propriety of receiving what they had to say at all, and *371 having regard to the time at which all that they testified took place.
In respect to the opinion vouchsafed by them as to the time within which a rescue could have been effected, while we do not think that in that time even a physical possibility of saving of the man was shown, we do not, aside from that, regard the testimony as having any legal value. Its force is destroyed by the annexed condition that the rescuer must be an “ active man, ’ ’ or a “quick active man,” which condition was not allowable in this case. In other words, the hypothesis did not square with the requirement of the law.
The defendants were called upon to employ for their freight elevator service a man fit for their work in that respect, and not a Harvard graduate. They were not bound to furnish a man “quick” enough and “active” enough to insure getting a man out of trouble in their freight elevator, after he had by his own fault gotten himself in trouble, but only a man capable to operate the elevator in its ordinary and proper uses. We must reject this line of testimony altogether, not only for the reason we have now given, but also because the hypothesis takes no account of the rule of law that Joseph was under no obligation to act, if by acting he put his own safety in peril — which we think would have been the ease here. The opinion also ignores the question of proof of the time when Joseph first knew of Burton’s danger and the consequent necessity for his acting at all.
We consider that the testimony of these two men — Mutton and Clark — was all that in any view of the case could have sent it to the jury, or that could be used later to support the judgment. And we think it has no probative value. -
The burden was on the plaintiff; it at no time shifted. Has it been borne? We think it has not.
The undisputed, mathematical evidence is to the effect that the elapsed time between the earliest moment when Joseph’s attention could have been challenged to the impending peril of the plaintiff’s intestate and when the latter was forced from the elevator’s edge into the shaft and to his death, was insufficient and inappreciable to form a judgment of rescuing him and making it effective by any mode or manipulation within that interval either practicable or possible. The entire transaction, both as to the *372 negligence of Burton in putting himself in a place of peril and any possible call of duty which could have been imputed to Joseph, and through him to his master, the defendant, was simultaneous, and not a separable transaction. If there was negligence on both sides — on the one side apparent and admitted, or at least proved beyond dispute — and on the other sought to be imputed — it was a concurrent, abiding and continuing negligence. There was no interval of time or circumstance, at which a jury could properly interpose a bar of separation between where the negligence of one party ended and that of the other could have begun. At most — if indeed so much — the two negligences — if two there were, which we think is not proved or properly to be imputed — shaded into each other so imperceptibly as to result in a twilight zone, covering both alike with its mantle of legal consequence. Such negligence — admitting its dual character — is not to be, can not be, apportioned by a jury, or an attempted partition of it allowed to stand by a reviewing court.
In Anderson v. Missouri Pac. Ry. 95 Neb. 358, 359 [145 N. W., 842, 843], the Supreme Court of Nebraska says:
“The doctrine of the last clear chance has no application to the ease where a section foreman in a railroad company’s yards suddenly goes upon the track in front of a moving train of cars, at a point so near the engine that it was impossible to stop and avoid injuring him. ’ ’
We think this case is that case — exactly, in that it involves, as the determining consideration, the impossibility of avoiding, injury to one in the first instance himself, negligent, and that in this view — the impossibility appearing clearly, no room is left for the application of the only rule of law upon a recovery is, or indeed can be, claimed.
We find and hold that upon the undisputed testimony this case is within the rule which by Drown v. Northern Ohio Trac. Co., supra, denies a recovery to the injured party or his representative — in this case, the plaintiff below. It follows that the court below should have sustained the motion for a new trial. It was error to refuse it, as was done.
For that reason, the judgment complained of is reversed.
As this determination proceeds upon the footing that the material facts in the record are not in dispute, in regard to *373 which diverse conclusions could not have been reached by different persons, and that the question remaining is one of law only, our opinion is that final judgment for the plaintiff in error should be entered by this court, which is accordingly done.
We have been materially aided in our examination of this matter by the thoroughgoing briefs of counsel which have most industriously brought before us both the facts of the record and the law of the case.
Dunlap and Washburn, JJ., concur.